

FILED
IN OPEN COURT

DEC - 5 2025

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 2:25cr128 |
| v. | |
| COREY SMITH | |
| Defendant. | |

## STATEMENT OF FACTS

The United States and the defendant, COREY SMITH (hereinafter, the defendant or SMITH), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. SMITH, and others known and unknown, respectively the "Conspirator" and collectively the "Conspirators," resided in the Eastern District of Virginia.

2. Navy Federal Credit Union (NFCU) is a financial institution as defined by Title 18, United States Code, Section 20. NFCU was a credit union with accounts insured by the National Credit Union Share Insurance Fund.

3. NFCU is one of the largest credit unions in the United States, offering membership to members of the Armed Forces and their families. A full suite of financial products is provided to members, including checking accounts, savings accounts, and personal loans. Members can access their financial accounts remotely by mobile application. The mobile application allows members to access current account balances, transfer funds from one account to another, transfer funds to outside financial institutions, and apply for consumer loans.

4. Zelle is a financial services company that facilitates the direct transfer of funds between financial institutions. NFCU is a participating financial institution in the Zelle network,

CS  CL



allowing members to transfer funds to other NFCU members or transfer funds to NFCU non-members at outside financial institutions. Zelle is available to NFCU members through the NFCU mobile application.

5. Cash App, a company of Block Inc., is a financial services platform that provides account holders access to peer-to-peer payments, direct deposit, and other services available through the Cash App mobile application. A Cash App account is linked to an account holder's bank account to facilitate the transfer, withdrawal, and deposit of funds. When funds are transferred to a Cash App account from a financial institution, those transactions are sent via wire to a local server and then replicated to all other physical servers within the Cash App supporting infrastructure. Cash App servers include data centers located in: 1) San Jose, California, 2) Ashburn, Virginia, and 3) Tokyo, Japan.

6. NFCU offers its members a financial product referred to as a Personal Expense Consumer Loan (PEC). The PEC is a personal loan that a member may apply for via the NFCU mobile application and receive funds deposited directly into their chosen NFCU banking account within minutes of completing the application. The PEC loan server is located in San Antonio, Texas.

7. Since at least January 2023 through the present, in the Eastern District of Virginia, including the cities of Portsmouth, Chesapeake, Suffolk, Virginia Beach, and Norfolk, and elsewhere, fraud schemes have been prevalent that are perpetuated in parking lots near NFCU branches. The Conspirators, including SMITH, would target victims in publicly accessible places, including parking lots, gas stations, shopping districts, and gyms, and convince victims, through deceit and intimidation, to give the Conspirators access to the victims' mobile devices. The

CS a



Conspirators would then make unauthorized loan applications, financial disputes, transfers, and withdrawals from the victims' accounts via the NFCU mobile application.

8. The evidence and investigation substantiate beyond a reasonable doubt that, between in or about October 2023, and continuing to at least in or about April 2025, in the Eastern District of Virginia and elsewhere, the defendant and the Conspirators, along with others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree with each other and others known and unknown, to commit the following offense:

> <u>Wire Fraud:</u> Defendant, and others known and unknown, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted, and attempted the same, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of execution of such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>OBJECT OF THE CONSPIRACY, SCHEME AND ARTIFICE TO DEFRAUD</u>

9. The object of the scheme and artifice to defraud was for SMITH and the Conspirators, and others known and unknown, to fraudulently obtain funds to which they were not entitled by deceit and intimidation, namely by obtaining access to victims' NFCU banking accounts, submitting fraudulent loan applications to NFCU in the victims' name, and creating financial disputes, transfers, and withdrawals from victims' accounts, and transferring the loan proceeds to themselves.

CS



## WAYS, MANNER AND MEANS OF THE CONSPIRACY, SCHEME AND ARTIFICE TO DEFRAUD

10. SMITH and the Conspirators effectuated the conspiracy through numerous forms of deceit and intimidation to obtain access to the victim's mobile devices and the financial institution and financial services mobile applications located on the device. This occurred primarily through a "parking lot scam" where SMITH and the Conspirators would strategically approach a victim and convince the victim to give the Conspirator access to their mobile device in a parking lot.

11. SMITH and the Conspirators generally targeted a victim, referenced as a "mark," whom they identify as probable account holders with NFCU, with such identifying characteristics as military age males who appear non-confrontational.

12. SMITH and the Conspirators generally approached the mark in a public setting, such as a gas station or a parking lot, typically from within a rental vehicle leased under the name of a Conspirator, holding multiple adult males, and sometimes minor children.

13. SMITH and the Conspirators generally designated a "talker," otherwise referred to as a "dragger," who approached the mark and initiate a conversation. The dragger then asked the mark if they have an NFCU account or are a member of NFCU. If the mark responded affirmatively, the talker then presents a falsity that they cannot access their own NFCU account at the automated teller machine (ATM) or are otherwise in need of financial assistance.

14. If the mark agreed to assist the dragger, the dragger offered to compensate the mark with money provided through a peer-to-peer payment by way of financial services applications, such as Zelle or Cash App. The dragger then convinced the mark to convey the victim's mobile device so that the dragger could access his own account to send the mark compensation.



15. SMITH and the Conspirators then made unauthorized transactions from the victim's accounts to the accounts of SMITH and the Conspirators and others known and unknown and obtained the personally identifiable information (PII) and financial information of the victim.

16. SMITH and the Conspirators escalated tactics when a mark would not comply with their initial ruse. The dragger continued to urge compliance, in some instances by physically taking the mobile device from the mark and holding it to the mark's face to obtain biometric access. In another instance, a Conspirator in the vehicle made a firearm visible to the mark.

17. Once in possession of the victim's mobile device, SMITH and the Conspirators who were outside the vehicle or who remained in the vehicle would act as the "phone controller" and execute a variety of illicit acts to obtain funds from the victim, dependent on the situation, including but not limited to:

   a. SMITH and the Conspirators submitted fraudulent PEC loan applications to NFCU via the victim's NFCU mobile application, directing the funds to be deposited into a victim's savings account, thereafter transferring the funds to the victim's checking account to conceal the funds originated from a loan disbursement;

   b. SMITH and the Conspirators disputed large debits in the victims' banking accounts, and NFCU would temporarily credit the victim's account for the disputed funds, which increased the funds available in the victim's account for the Conspirator to unlawfully obtain;

   c. SMITH and the Conspirators accessed and transferred a victim's PII to Conspirators;




  d. SMITH and the Conspirators obtained the victim's log-in information for financial accounts and provided to Conspirators;

  e. SMITH and the Conspirators accessed and transferred the victim's banking information to other Conspirators; and

  f. SMITH and the Conspirators transferred funds from the victim's Cash App account(s) to account(s) accessible by, or under the name of, Conspirators.

18. After a phone controller executed illicit acts on a victim's mobile device, SMITH and the Conspirators then misled the victim by stating that the Conspirator had transferred too much money back to the victim, showing the increased funds available in the victim's checking account. SMITH and the the Conspirators then requested the alleged "excess" funds from the victim and obtained the excess funds from the victims. Returns were made by:

  a. Cash App, providing the Cash App account of a Conspirator, or another victim, to the victim;

  b. Zelle, providing the Zelle information of a Conspirator, or another victim, to the victim; and / or

  c. NFCU member-to-member transfer to an NFCU account of a Conspirator, or another victim.

19. In situations where a victim's account had a limit on the amount of funds that could be transferred in a single day, such as Cash App, SMITH and the Conspirators would urge the victim to obtain a money order from a store, or cash from an ATM, while they followed the victim.

20. As SMITH and the Conspirators had obtained the PII of the victim, when a victim became aware that they were being defrauded, the Conspirators would contact the victim, up to days after the incident, stating words to the effect that the Conspirators knew where the victim lived and alleging that the victim had "their" (the Conspirators) money.

21. SMITH and the Conspirators concealed their illicit acts by covering their digital footprint on the victim's device, including deleting email notifications of the fraudulent loans, the Cash App transfers, and other financial transactions. In some instances, the Conspirators would delete the banking mobile applications and return the victims' mobile device to them in airplane mode, whereby a victim would not receive cellular signal and be notified of any recent transactions until they manually resumed connectivity of their mobile device.

22. SMITH and the Conspirators concealed illicit funds by having the initially obtained funds transferred to a co-Conspirator's financial account, including NFCU, Venmo and Cash App. The funds would then be disbursed between multiple Conspirators and accessed in a variety of means, including transfers, cash withdrawals using ATMs, and by expenditures of multiple Conspirators' use of the same banking account. The Conspirators would use the accounts of victims to transfer funds, adding another layer of concealment.

23. In the course of the commission of committing wire fraud, SMITH utilized the financial services platforms of the Conspirators and others to facilitate the fraud. Specifically, SMITH would access their accounts on CashApp, Zelle, Apple Pay, and other platforms to effectuate the scheme described above.

24. The evidence and investigation substantiate beyond a reasonable doubt that, on or around November 11, 2023, in the Eastern District of Virginia and elsewhere, the defendant, COREY SMITH, the Conspirators, and others known and unknown, devised and intended to

*CS* *CL*

devise a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and did transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purposes of execution of such scheme and artifice. To wit, on or around November 11, 2023, among other dates, SMITH, for the purpose of executing the scheme described below, caused to be transmitted the following fraudulent wire communications:

| DATE (ON OR ABOUT) | WIRE SOURCE | DESCRIPTION |
|---|---|---|
| November 11, 2023 | Navy Federal Credit Union and CashApp | In Norfolk, Virginia, SMITH and two conspirators asked VICTIM 1 to use VICTIM 1's phone to locate a Navy Federal Credit Union branch because their debit card did not work. SMITH obtained VICTIM 1's phone, and without permission, transferred $1,000 out of VICTIM 1's Navy Federal Credit Union account, whose servers are located in San Antonio, Texas, via Cash App/Block Inc., |

25.   The evidence and investigation substantiate beyond a reasonable doubt that SMITH obtained $750 from VICTIM 2's Navy Federal Credit Union account whose servers are located in San Antonio, Texas, and facilitated a transfer through a third party from VICTIM 2's Navy Federal Credit Union Account back to himself via Cash App/Block Inc. SMITH contended to the third party that he had gotten drunk the night before and lost his wallet.

26.   This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case. The actions of the defendant, as recounted above, were in all




respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Lindsey Halligan
United States Attorney

Date: 12/5/25

By: _____
Clayton D. LaForge
Assistant United States Attorney



After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, COREY SMITH, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
COREY SMITH

I am Mark Stokes, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Mark Stokes, Esq.
Attorney for Corey Smith